UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| JOSEPH FROST and HEATHER FROST, <br><br> Plaintiffs, <br><br> vs. <br><br> PROGRESSIVE DIRECT INSURANCE COMPANY, <br><br> Defendant. | 1:25-CV-01002-CCT <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING AS MOOT DEFENDANT'S SECOND MOTION TO STAY DISCOVERY AND DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S ORDER** |

The defendant, Progressive Direct Insurance Company, moves for partial summary judgment on the plaintiffs' claims of bad faith and related requests for attorney fees and punitive damages. Docket 10. It asserts that there are no material facts that create a genuine issue as to whether Progressive acted in bad faith when evaluating the value of the plaintiffs', Joseph and Heather Frost's, uninsured motorist insurance claims. Docket 11 at 1–2. The Frosts oppose summary judgment, alleging that Progressive engaged in an unfair and inadequate investigation of their claims and, alternatively, that additional discovery is needed for them to properly respond to Progressive's motion. Docket 23 at 1–2.

For the reasons explained below, Progressive is entitled to summary judgment on the Frosts' bad faith insurance claims, and the current record is sufficient to address these claims.

1

## BACKGROUND

### I.    Factual

Consistent with the summary judgment standard, the Court considers all disputed facts in a light most favorable to the nonmovants, the Frosts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). These are the pertinent facts.

Joseph Frost was driving his motorcycle in Lake Norden, South Dakota, on July 3, 2023, with his wife Heather as a passenger, when a vehicle pulled out from a parking lot in front of them. Docket 14-1 at 71; Docket 24 ¶ 1. Joseph steered to avoid hitting the vehicle, which caused the motorcycle to fall on its left side and injured the Frosts. Docket 13 at 1, 9; Docket 23 at 3. Emergency personnel examined the Frosts at the scene, but the Frosts did not go to an emergency room that day. Docket 24 ¶ 3. Progressive was notified on July 4 of the accident, and in a telephone conversation with one of its adjusters on July 5, Joseph explained the accident details and his and Heather's injuries. *Id.* ¶¶ 4–6. He stated that he had pain in his left shoulder, hip, elbow, and ribs from the accident and also abrasions and road rash. *Id.* ¶ 6; Docket 13-1 at 12 (mentioning photos of road rash). He also indicated that the pain had improved. Docket 24 ¶ 7 ("It's not as bad now, two days later.").

Joseph saw Dr. Horn at the Brown Clinic on July 5 for his injuries and pain from the accident. *Id.* ¶¶ 8–9. At this appointment, Dr. Horn took x-rays of Joseph's left elbow, ribs, hip, and chest, and she noted that "there could be a tiny fracture over the olecranon." *Id.* ¶¶ 9–10. Otherwise, the x-rays did not

2

indicate anything remarkable or out of the ordinary aside from soft tissue swelling also on the elbow, but Dr. Horn intended to nonetheless verify these findings with an overread. *Id.* ¶¶ 10–12.

On August 18, Joseph underwent an MRI on his injured elbow, which indicated an area of soft tissue bursitis and an olecranon spur. *Id.* ¶ 13. Surgery was recommended. *Id.* ¶ 39. The surgery itself was estimated to cost $11,353. *Id.* ¶ 18. Up to that point, Joseph had accrued $2,444 in medical expenses. *Id.* ¶¶ 15, 17.

Heather also saw Dr. Horn, who was her primary care provider, on July 5. *Id.* ¶¶ 26, 27. Heather complained of an abrasion on her left shoulder and back pain, which Dr. Horn attributed to the accident. *Id.* ¶ 26. Heather also had x-rays of her spine taken during that appointment, which showed there was no "acute abnormality." *Id.* ¶¶ 28, 29. The only other medical care Heather received regarding the accident was from an appointment on July 7, where Heather consulted Dr. Horn again for her acute back pain and other unrelated concerns. *Id.* ¶ 30–32; Docket 13-23 at 95–97, 118. Including the appointment on July 7, Heather's medical expenses from the accident totaled $504. Docket 13-23 at 116–18; Docket 24 ¶ 31.

While processing the Frosts' insurance claims and medical records, Progressive found the driver who pulled out in front of the Frosts to be 100% at fault for the accident. Docket 24 ¶ 1. This driver was uninsured. *See id.* ¶ 2. As such, the Frosts' claims became uninsured motorist (UM) insurance claims. *Id.* On March 14, 2024, the Frosts' counsel sent Progressive a combined

settlement offer of $69,000, with $49,500 attributable to Joseph's UM claim and $19,500 to Heather's. Docket 24 ¶ 35; Docket 13-9 at 4.

Progressive requested further information to fully evaluate the Frosts' claims, including bills and records from the accident. Docket 14-1 at 42–43. On March 29, Progressive made a counteroffer on Joseph's UM claim for $12,600 based on records it already had, but it requested a further statement from Joseph to ensure it was considering all elements of his claim. Docket 14-1 at 38. To this end, Progressive, Joseph, and the Frosts' counsel discussed Joseph's claim during a conference call on May 8, 2024. Docket 14-1 at 34.

As it relates to Heather's claim, Progressive informed the Frosts that it could "neither accept nor deny" the settlement offer because it lacked sufficient documentation, despite the Frosts already providing a medical authorization for Progressive to access Heather's medical records on August 16, 2023. *Id.* at 40; Docket 24 ¶ 36 (citing *id.* at 56). The Frosts sent Heather's medical information to Progressive again on May 2, 2024. Docket 24 ¶¶ 33, 37.

On July 18, Joseph provided Progressive gross wage information via his past payment records. *Id.* ¶ 33; Docket 25-7 at 1 (containing also that Joseph thought he would not work for about two weeks after surgery). The average weekly wages in these records were about $4,250. Docket 25-7 at 1. The Frosts' counsel later indicated that the value of Joseph's lost gross wages would be about $8,000 for two weeks. Docket 24 ¶¶ 19–20.

On August 6, the Frosts' counsel informed Progressive that he believed it should have everything it needed to evaluate the UM claims. *Id.* ¶ 41.

4

Progressive then made a new total UM settlement offer of $26,775 ($23,770 for Joseph's claim and $3,005 for Heather's) on August 16. *Id.* ¶ 43. Progressive came to this valuation based on the Frosts' medical records and expenses, including Joseph's anticipated surgery cost but not his lost wages, and Heather's noneconomic damages of fear and reluctance to ride a motorcycle again, which was valued at $1,500 to $2,500. Docket 14-1 at 26–28.

The Frosts counteroffered on September 10 with $48,000 as their "best and final settlement offer." Docket 24 ¶ 44. Progressive countered on September 17 with $40,267; $36,767 allocated to Joseph's claim and $3,500 to Heather's. *Id.* ¶ 45. Progressive considered Joseph's lost wages as part of this offer and noted that reserves on the Frosts' claims needed to be increased to $55,000. Docket 14-1 at 14, 16–17.

The Frosts responded to Progressive's counteroffer on February 25, 2025, after Progressive attempted to reach their counsel multiple times. Docket 24 ¶ 46. Their counsel attributed his response time to difficulty in reaching his clients because of Heather's ongoing cancer treatment and to the fact the Frosts had already indicated that $48,000 was their final and best offer. *Id.* Ultimately, the Frosts rejected Progressive's counteroffer, indicating that Progressive had "lowballed an offer on a settlement amount that [the Frosts] provided and which was already less than the full value of this claim." *Id.* ¶ 48; Docket 13-15 at 1. The Frosts also noted that they were unsure how Progressive valued their "economic and non-economic damages (physical pain and suffering, mental and emotional anguish, disability, disfigurement and loss

5

of enjoyment of life) and the loss of consortium." *Id.* ¶ 48. The Frosts indicated that they would bring suit against Progressive. Docket 13-15 at 2.

Two days later, Progressive called the Frosts' counsel and communicated a new settlement offer of $45,000 ($41,000 to Joseph and $4,000 to Heather). Docket 24 ¶ 49. It put this offer in writing to the Frosts later that day. Docket 13-16. The Frosts rejected this offer on March 4 and commenced suit against Progressive. Docket 24 ¶ 51; *see* Docket 1 (filed on March 4, 2025).

## II.    Procedural

In their complaint, Joseph and Heather each pled causes of action for breach of contract and bad faith. Docket 1 at 3–8. As it relates to the bad faith claims, the Frosts sought attorney fees and punitive damages. *Id.* at 8. On June 30, 2025, Progressive moved for partial summary judgment on bad faith and the corresponding request for punitive damages and attorney fees. Docket 10 at 1. The Frosts opposed the motion on July 28, 2025. Docket 23. In their motion, the Frosts alternatively requested that the Court delay ruling or deny the motion entirely to allow further discovery, "[t]o the extent the Court believes the current evidence is insufficient to create a genuine issue of material fact." *Id.* at 21. They filed an affidavit in support of this request. Dockets 26.

### SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate and may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(a) places the burden initially

on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Foster v. Ethicon, Inc.*, 529 F. Supp. 3d 992, 996 (D.S.D. 2021). "The moving party can meet this burden by presenting evidence that there is no genuine dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof." *Finneman v. United States Dep't of Ag.*, No. 5:23-CV-05034-KES, 2024 WL 5158473, at *4 (D.S.D. Dec. 17, 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

If "the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by 'citing to particular parts of materials in the record' or 'by showing that the materials cited do not establish the absence . . . of a genuine dispute.'" *Foster*, 529 F. Supp. 3d at 996 (citations omitted). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation modified). A court views the evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Finneman*, 2024 WL 5158473, at *5; *Foster*, 529 F. Supp. 3d at 997.

However, "[a] party opposing a properly supported motion for summary judgment 'may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or

fantasy.'" *Foster*, 529 F. Supp. 3d at 997 (citation omitted); *see also Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). A court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.,* 87 F.3d 256, 260 (8th Cir. 1996). But it may "consider any specific, non-conclusory facts alleged in [the verified complaint]." *Roberts v. United States*, No. 4:23-CV-04116-CCT, 2025 WL 789393, at *3 (D.S.D. Mar. 12, 2025) (citing *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001)).

## DISCUSSION

### I.      Bad faith claims

Progressive asserts that it conducted a reasonable investigation when processing the Frosts' claims. Docket 11 at 18. It notes that the Frosts' counsel was involved a month after the accident and provided Progressive information necessary to evaluate the Frosts' claims. *Id.* It then contends that the Frosts' claims are "nothing more than a dispute about valuation." *Id.* at 20. And, according to Progressive, "a dispute about valuation is not grounds for bad faith." *Id.* at 23. Moreover, it claims the valuation of the Frosts' claims was fairly debatable, and it did not owe the Frosts a duty to give equal consideration to the Frosts' valuation because their interests are not considered equal in these kinds of first-party insurance claims. *Id.* at 19, 23.

8

Further, Progressive argues that the Frosts cannot "show both that there was an absence of a reasonable basis for Progressive Direct's valuation and that Progressive Direct knew or recklessly disregarded the fact that it did not have a reasonable basis for such a belief." *Id.* at 23.

"Federal courts sitting in diversity apply the substantive law of the forum state." *Leffring v. CSAA Fire & Cas. Ins. Co.*, No. 4:23-CV-04010-KES, 2025 WL 2410362, at *2 (D.S.D. July 3, 2025) (citing *Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014)). When applying state substantive law, federal courts adhere to the decisions of that state's supreme court in interpreting the forum's law. *Id.* (citing *C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019)). Neither party disputes that South Dakota law applies.

The claim of first-party insurance bad faith "is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." *Zochert v. Protective Life Ins. Co.*, 921 N.W.2d 479, 490 (S.D. 2018) (quoting *Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685, 700 (S.D. 2011)); *Sapienza v. Liberty Mut. Fire Ins. Co.*, 389 F. Supp. 3d 648, 660 (D.S.D. 2019) (quoting *Hein v. Acuity*, 731 N.W.2d 231, 235 (S.D. 2007)). "A first-party bad faith claim in South Dakota may be based on a 'failure to comply with a duty under the insurance contract,' but still must involve 'an insurance company consciously engaging in wrongdoing.'" *Sapienza*, 389 F. Supp. 3d at 660 (quoting *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 629 (S.D. 2009)) (citation modified). "The question of whether an insurer has acted in bad faith is

9

generally a question of fact." *Fiechtner v. Am. W. Ins. Co.*, 27 N.W.3d 746, 759 (S.D. 2025) (citation omitted).

In first-party cases, "the insurer and insured are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable. However, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith." *Id.* at 758 (citation modified) (quoting *Harvieux v. Progressive N. Ins. Co.*, 915 N.W.2d 697, 701 (S.D. 2018)). The elements a plaintiff must prove to succeed on a bad faith claim are: "(1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial." *Id.* (quoting *Harvieux*, 915 N.W.2d at 701). "Despite the phrasing of this test, first-party bad faith 'can extend to situations beyond mere denial of policy benefits.'" *Sapienza*, 389 F. Supp. 3d at 660 (quoting *Dakota, Minn.*, 771 N.W.2d at 629).

"When the issue is the delay of payments, rather than outright denial, the plaintiff 'must demonstrate that there was an absence of a reasonable basis for the delay and defendants' knowledge, or reckless disregard, of the absence of a reasonable basis.'" *Zochert*, 921 N.W.2d at 490 (quoting *McDowell v. Citicorp U.S.A.*, 734 N.W.2d 14, 19 (S.D. 2007)). "The knowledge or reckless disregard of a reasonable basis may be inferred based on 'indifference to facts or to proofs submitted by the insured.'" *Id.* (quoting *Champion v. U.S. Fid. & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987)). Additionally, while claim "[r]eserves may be relevant and admissible evidence, [they] do not necessarily

10

reflect valuation of the claim." *Wiebers v. Farmers Mut. Hail Ins. Co. of Iowa*, No. 4:17-CV-04126-RAL, 2019 WL 6769546, at *7 (D.S.D. Dec. 12, 2019).

"Bad faith conduct may include the failure to conduct a reasonable investigation concerning the claim." *Fiechtner*, 27 N.W.3d at 758–59 (quoting *Dakota, Minn.*, 771 N.W.2d at 629). "For a bad faith claim premised on an insurer's inadequate investigation of a claim to succeed, there must be some causation between the insurer's inadequate investigation and its denial of the insured's claim." *Id.* at 759.

Here, like *Harvieux*, the Frosts allege that their insurer acted in bad faith by lowballing settlement offers. *See* 915 N.W.2d at 701–03 (arguing that the insurer engaged in unfair practices and institutional bad faith as a whole when negotiating settlement offers). But, as the South Dakota Supreme Court determined in *Harvieux*, there must be evidence that the insurer "did not have a reasonable basis for its valuation" and that the insurer "knew there was not a reasonable basis for its valuation." *Id.* at 702.

In that regard, the Frosts point to Progressive's note in Joseph's claim file that it was not considering his lost wages in its offer in August of 2024, despite receiving gross wage information from Joseph as evidence of bad faith surrounding its investigation and evaluation of his claim. Docket 23 at 16; *see* Docket 14-1 at 26 ("no loe considered @ this time as don't have rx on how long would be out and not clear on wages"). They claim this is enough evidence to support bad faith because this note was used in calculating Progressive's claim settlement offer of August 16, 2024, of $26,775 and shows that Progressive did

11

not consider the wage information that had been provided by Joseph in its offer. Docket 23 at 9, 16.

But Progressive's two subsequent, pre-litigation settlement offers of $40,267 and $45,000 do not indicate it declined to consider Joseph's lost wages, and in fact the claims file shows his potential, future lost gross wages were considered. Docket 14-1 at 22 (noting Joseph's wages prior to the September 17, 2024 offer). Moreover, even though Progressive did not inquire further to obtain Joseph's net wage information, the Frosts do not point to record evidence that Progressive's treatment of Joseph's anticipated wage loss for a surgery that had not yet occurred rose to the level of conscious wrongdoing expected for a bad faith claim. *See Harvieux*, 921 N.W.2d at 491 (holding there were "no disputed material facts which suggest [the defendant-insurer] acted with the kind of conscious wrongdoing required to sustain a bad faith tort claim"). To the contrary, Progressive valued Joseph's claim using the higher, gross wage amount.

The Frosts also identify that the claims file shows Progressive did not appear to consider Heather's medical visit of July 7, 2023, as part of its offers. Yet, this expense arose from an appointment made before the accident occurred and is thus fairly debatable. Even so, at most the Frosts have shown that Progressive did not consider this appointment in its offers, not that Progressive acted wrongfully in not considering it. The Court further notes the subjective nature of noneconomic damages, as recognized by the Frosts. *See* Docket 23 at 20 (recognizing that noneconomic damages may be subjective); *cf.*

*Morrissey v. Welsh Co.*, 821 F.2d 1294, 1301 (8th Cir. 1987) (holding, in the context of jury verdicts and under Missouri law, that as "in the case of awards for loss of consortium, awards for pain and suffering are highly subjective" and "[d]epending upon the fact situation, the range between an inadequate award for pain and suffering and an excessive award can be enormous"). As such, the valuation of the Frosts' noneconomic damages, namely Heather's fear of motorcycles, pain and suffering, and the Frosts' lack of riding a motorcycle together, does not indicate a material issue of fact in dispute on the bad faith claims.

The Frosts also argue that Progressive acted in bad faith because it did not hire outside counsel or an accounting specialist to evaluate their claims like the defendant-insurer did in *Anderson v. W. Nat'l Mut. Ins. Co.*, 857 F. Supp. 2d 896 (D.S.D. 2012). Docket 23 at 21. This argument fails in light of Progressive's actual conduct. Insureds are not held to a standard of perfection in completing their work to avoid a label of conscious wrongdoing. *See Sapienza*, 389 F. Supp. 3d at 660, 663; *Anderson*, 857 F. Supp. 2d at 905 ("a failure to investigate, without more, does not constitute bad faith").

Nevertheless, the Frosts rely on Progressive's increase in its reserves for bad faith, an increase made without any new accident expenses. But as the court in *Wiebers* wrote, an insurer's reserves "do not necessarily reflect valuation of the claim." 2019 WL 67696546, at *7. Simply because the reserves may have been set higher than the Frosts' offer does not in turn mean Progressive's calculations and own offers and counteroffers were made without

13

a reasonable basis. Therefore, the increase in the reserve amount itself does not foreclose summary judgment on the Frosts' bad faith claim.

In the end, Progressive has met its burden to show the absence of a genuine issue of material fact regarding the Frosts' bad faith claims. As such, Progressive is entitled to partial summary judgment on the Frosts' bad faith claims and corresponding requests for attorney fees and punitive damages.

## II.     Rule 56(d)

Alternatively, the Frosts request under Federal Rule of Civil Procedure 56(d) that this Court delay ruling on or deny Progressive's motion for partial summary judgement to allow for further discovery. Docket 23 at 22. They note that the "action was only initiated on March 4, 2025, no depositions have been taken either, and no expert witnesses have been designated." *Id.* at 26. They also claim Progressive "has refused to respond to any discovery it deems relevant to the bad faith claim." *Id.* They refer in particular to Progressive's claim manuals, average number of pending claims and closed claims for adjusters, personnel files of adjusters, and documents related to complaints Progressive received from insureds. *Id.* 23–25. In their view, discovery is necessary to allow them to show there are genuine material issues of fact in dispute. *Id.* at 23. As an example, they contend that discovery could show that Progressive's adjusters violated its "relevant policies and procedures." *Id.* at 23.

Under Rule 56(d):

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

14

(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "Rule 56(d) 'allows a party to request a delay in granting summary judgment if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact.'" *Huntimer v. Young*, No. 4:23-CV-04005-ECS, 2025 WL 834583, at *5 (D.S.D. Mar. 17, 2025) (quoting *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2006)).

"The party seeking additional discovery must show: '(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion.'" *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 895 (8th Cir. 2014) (citation omitted); *Johnson v. Moody*, 903 F.3d 766, 772 (8th Cir. 2018). However, "Rule 56(d) does not condone a fishing expedition where a plaintiff merely hopes to uncover some possible evidence of unlawful conduct." *Johnson*, 903 F.3d at 772 (quoting *Toben*, 751 F.3d at 895); *Huntimer*, 2025 WL 834583, at *5. Thus, "[m]ere speculation that there is some relevant evidence not yet discovered will never suffice." *Johnson*, 903 F.3d at 772 (approving district court's ruling that plaintiffs' discovery requests were based only on "'speculative hope' of finding evidence"). District courts possess "wide discretion in deciding a [Rule] 56(d) motion." *Id.*

15

The Frosts have not shown they are entitled to a delay or denial of Progressive's partial summary judgment motion on their bad faith claims. While they suggest facts they hope to discover, they speculate as to what they may find in the internal documents and depositions of Progressive's claim adjusters regarding how it valued their insurance claims. Therefore, they have not shown that specific facts exist. *See Keebler Co. v. Murray Bakery Prods.,* 866 F.2d 1386, 1389 (Fed. Cir. 1989) ("If all one had to do to obtain a grant of a Rule 56([d]) motion were to allege possession by movant of 'certain information' and 'other evidence', every summary judgment decision would have to be delayed while the non-movant goes fishing in the movant's files.")

They also have not established that additional discovery is necessary to resist Progressive's partial summary judgment motion. Rather, they speculate that other internal documents of Progressive would be responsive to Progressive's motion. Like in *Huntimer*, the Frosts "merely hope to uncover some possible evidence of unlawful conduct" through these additional documents and, thus, seek to engage in a "fishing expedition." 2025 WL 834583, at *5 (citation modified). As such, the Court denies the Frosts' Rule 56(d) request to defer ruling on or deny Progressive's motion for partial summary judgment.

## III.    Progressive's motions for a protective order to stay discovery

Progressive has two other pending matters before this Court, an objection to Magistrate Judge Moreno's order, Docket 32, on its motion for a protective order to stay discovery, Docket 16, and a second motion to stay

16

discovery, Docket 33. Both of Progressive's motions were pending the resolution of its partial summary judgment motion. Because this Court determines that Progressive is entitled to partial summary judgment as requested, Progressive's objection and second discovery motion are now moot.

## ORDER

Accordingly, it is hereby

ORDERED that Progressive's motion for partial summary judgment regarding the bad faith claims and their associated punitive damages and attorney fees demands, Docket 10, is granted. It is further

ORDERED that Progressive's objection to Magistrate Judge Moreno's order denying its motion to stay discovery, Docket 32, is denied as moot. It is further

ORDERED that Progressive's second motion to stay discovery, Docket 33, is denied as moot.

Dated March 25, 2026.

BY THE COURT:

/s/ *Camela C. Theeler*

CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE